UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

JENNIFER PRICE,

    Plaintiff,

v.

UTI, UNITED STATES, INC. D/B/A UTI INTEGRATED LOGISTICS,

"JOHN DOE,"

    and,

"JANE ROE,"

    Defendants.

Case No. 11-1428

JURY TRIAL DEMANDED

## CIVIL COMPLAINT

Plaintiff Jennifer Price ("Price") pleads, as follows, causes of action against her former employer, UTi, United States, Inc. d/b/a UTi Integrated Logistics ("UTi") for violations of the Americans with Disabilities Act ("ADA"), Title VII of the Civil Rights Act ("Title VII"), and the Family and Medical Leave Act ("FMLA"), and for violations Missouri state law under the Missouri Human Rights Act ("MHRA"), breach of implied contract, promissory estoppel, and equitable estoppel.

### PARTIES

1.     Price, at all relevant times herein, was and is a resident of the State of Missouri.

2.     Price is female.

3.     Price was previously employed by UTi.

1

4. UTi, at all relevant times herein, was and is a business corporation organized under the laws of New York and registered to do business in Missouri. UTi's registered agent in Missouri is CSC-Lawyers Incorporating Service Company, located at 235 East High Street, Jefferson City, MO 65102. UTi has its principal place of business located at 100 Oceangate, Suite 1500, Long Beach, CA 90820.

5. UTi has a facility (the "Moberly facility") located at 1957 DD Hwy, Moberly, MO 65270.

6. UTi, at all relevant times herein, employed fifteen or more persons.

7. "John Doe" is an unidentified individual who was an employee and/or agent of UTi during relevant times herein.

8. "Jane Roe" is an unidentified individual who was an employee and/or agent of UTi during relevant times herein.

## ADMINISTRATIVE REQUIREMENTS

9. On November 1, 2010, Price properly filed a Charge of Discrimination against UTi with the EEOC and Missouri Commission on Human Rights.

10. On May 19, 2011, the EEOC issued Price a notice of right to sue, which is attached as Exhibit A.

11. This action was commenced by Price within 90 days of the issuance and receipt of the EEOC notice of right to sue.

## STATEMENT OF FACTS

12. Price was hired by UTi or its predecessor in August 2004.

13. As early as 2004, Price's supervisors had actual knowledge that she had a history of high-risk pregnancies and spontaneous abortion.

14. Sometime in July of 2009, Price learned that she was pregnant. That same day, Price informed her supervisor of this fact.

15. Sometime around July or August of 2009, UTi acquired the Moberly facility, including its managers and employees, from Exel, Inc.

16. In August of 2009, Price learned that she was carrying twins, and her treating physician, Dr. Trumbower, diagnosed Price's pregnancy as "high risk" and told Price to expect to be restricted to bed rest during the final trimester. Price immediately reported this expectation to her supervisor, who inquired whether Price would be able to perform "light duty" work during the final trimester as an alternative to bed rest.

17. In September of 2009, a new general manager, vice president, and human resource manager from UTi visited the Moberly facility. Price made the UTi representatives aware of her high risk pregnancy. Price specifically asked the new UTi vice president what effect the change in ownership would have in relation to her high-risk pregnancy. Price was told, "Don't worry. We will take care of you."

18. On or about October 1, 2009, UTi began to actively manage the Moberly facility. There was no change in business operations or location of the Moberly facility at this time.

19. During orientation, Price spoke to two female human resources representatives from UTi and made sure they were aware of her pregnancy and the "high risk" nature of her pregnancy.

20. In October of 2009, Price spoke to her general manager about taking short-term disability leave to accommodate the medical complications of her pregnancy. In response, the general manager made a telephone call and looked up some information on the internet, after which he told Price that she could take 22 weeks of short-term disability leave, with first month

3

at 100% pay and the following months at 80% pay.  Price was told at this time she could take 22 weeks of disability leave due to her pregnancy but that she "would be terminated after 22 weeks."

21. On December 1, 2009, Dr. Grant, a specialist who was treating Price due to her high risk pregnancy, diagnosed Price with an open cervix and advised Price that she might spontaneously abort the twins. Dr. Grant advised Price to begin immediate bed rest, told Price that he did not intend to allow her to carry her pregnancy past 38 weeks, and set her maximum delivery date at March 23, 2010.

22. After her appointment with Dr. Grant, Price had an appointment with Dr. Trumbower. When Price left Dr. Trumbower's office on December 1, 2009, she immediately called her supervisor, which gave rise to a lengthy telephone conversation lasting approximately 1 hour. When Price told her supervisor that her treating physician had recommended immediate bed rest, the supervisor replied, "I will set it up." Price was also told, "Your job will be held."

23. Based on the accommodation previously agreed upon by management, Price expected and believed she was placed on short-term disability leave for up to 22 weeks and that her job would be held during this period.  This set the end date of the agreed-upon range for Price's return-to-work at May 3, 2010.

24. In February 2010, an administrative assistant from UTi told Price that she would receive 100% pay for the entire 22 weeks she was on leave, contrary to what she was told in October 2009.  Price was again told at this time she could take 22 weeks of disability leave due to her pregnancy but that she "would be terminated after 22 weeks."  Also at this time, Price reminded the administrative assistant of her maximum delivery date.

4

25. On March 8, 2010, Price delivered twins by Cesarean section. Dr. Trumbower has a standard restriction that his patients not return to work until 6 weeks after a Cesarean section.

26. While on leave, Price frequently spoke with an agent or employee of UTi about her leave and short-term disability. Price was instructed to call this agent after delivery of her twins.

27. Shortly after delivery of the twins, Price called the UTi agent or employee to inform that her twins had been delivered. The agent or employee responded by instructing Price to report to work on May 3, 2010.

28. On March 23, 2010, Price called UTi and informed UTi she had delivered her twins and would be back by May 3, 2010.

29. On March 25, 2010, while Price was still on her agreed-upon pregnancy-related leave and disabled by her pregnancy, three representatives of UTI called Price and told her that FMLA leave had expired and that if she did not obtain medical clearance to return to work by March 31, 2010, she would be terminated on that date. Price communicated to the representatives that she needed the additional leave that was previously agreed to. This was the first time Price received any notice from UTi regarding FMLA leave.

30. On March 26, 2010, Price received a letter dated March 25, 2010 indicating that her FMLA leave had expired and that if she did not obtain medical clearance to return to work by March 31, 2010, she would be terminated on that date. This was the first time Price received any written notice from UTi regarding FMLA leave.

31. Prior to March 25, 2010, Price was never told that a 12-week FMLA leave period was running against her, and, to the contrary, she was led to believe that she had been granted the accommodation of a 22-week leave of absence, until May 3, 2010.

32. Both before and after March 25, 2010, UTi made no effort to engage in an interactive process with Price in good faith to explore possible accommodations for her disability if she could not return to work on March 31, 2010.

33. On March 31, 2010, Price was still disabled by her pregnancy and her medical condition, and she had not been cleared to return to work by Dr. Trumbower.

34. As previously threatened, UTi terminated Price on March 31, 2010.

35. At the time of her termination, Price had 34 days remaining on the leave of absence that UTi had previously agreed upon as an accommodation for the medical complications of her pregnancy.

36. At the time of her termination, Price had an unused balance of 45 hours of leave.

37. After her termination, Price did not receive 100% pay for the entire 22 weeks she was on leave as was represented to her in February 2010. UTi cut her pay at this time.

38. Price had no realistic opportunity to obtain medical clearance before her termination as she had delivered twins only shortly before March 25, 2010 and was only given until March 31, 2010 to obtain medical clearance to return to full duty.

## COUNT I – TITLE VII

### (Gender and Pregnancy Discrimination Against UTi)

Price incorporates by reference into Count I all preceding paragraphs herein.

39. At all relevant times herein, UTi had 15 or more employees.

40. UTi discharged Price.

41. UTi treated Price less favorably than other employees in the receipt of benefits, providing leave, holding jobs open, requiring medical clearance, and in providing notice on "return to work by" dates. In the alternative and on information and belief, UTi mislead, lied or

concealed from Price the length of the leave of absence that it was providing for her pregnancy, birth of child and/or related medical conditions.

42. Price's sex, pregnancy, birth of child and/or related medical conditions played a part or role in UTi's decision to discharge Price.

43. Price's sex, pregnancy, birth of child and/or related medical conditions played a part or role in UTi's actions and conduct in reducing the agreed-upon leave, requiring medical clearance, misleading her to believe her job would be held, and not providing her sufficient notice of her "return to work by" date.

44. On information and belief, Price's job was not held open on the same basis as jobs are held open for employees on leave.

45. Price suffered and continues to suffer damages as a direct and proximate result of UTi's conduct alleged in this Count I, including but not limited to lost wages; back pay; because her re-employment is impracticable, front pay; lost income and fringe benefits; future lost income and fringe benefits; incidental, consequential, and punitive damages; and damages for mental anguish and emotional suffering.

46. UTi acted with malice or reckless indifference to Price's rights to not be discriminated against on the basis of her sex, pregnancy, birth of child and/or related medical conditions, and were done in knowing violation of Title VII and the Pregnancy Discrimination Act. Such reckless and intentional conduct warrants the imposition of punitive damages on UTi.

## COUNT II – AMERICANS WITH DISABILITIES ACT
### (Disability Discrimination and Failure to Accommodate Against UTi)

Price incorporates by reference into Count II all preceding paragraphs herein.

47. Price suffered from a physical impairment that caused a risk to her ability to carry a pregnancy to full term.

48. Price suffered from a physical impairment that created a risk for spontaneous abortion of a fetus.

49. Price's physical impairment substantially limited her major life activities of such a nature that it constituted a disability as stated under the ADA.

50. Price was substantially limited in a number of major life activities, including, but not limited to working, and also substantially limited the operation of her major bodily functions, including, but not limited to, her reproductive functions.  Such limitations did not prevent Price from performing the essential functions of her job and she could perform her job with reasonable accommodations.

51. UTi was aware of Price's physical impairment.

52. UTi was aware of Price's history of high-risk pregnancies and spontaneous abortion.

53. Price's physical impairment and disability played a part or role in UTi's decision to discharge Price.  In the alternative, the record and past history of Price's impairment and/or Price being regarded as having an impairment played a part or role in UTi's decision to discharge Price.  Such discharge violated the ADA.

54. Price's physical impairment and disability played a part or role in UTi's actions and conduct in reducing the agreed-upon leave, requiring medical clearance, misleading her to believe her job would be held, and not providing her sufficient notice of her "return to work by" date.  In the alternative, the record and past history of Price's impairment and/or Price being regarded as having an impairment played a part or role in UTi's above-described actions and conduct. Such actions and conduct violated the ADA.

55. Price asked for reasonable accommodations of the UTi on several occasions as more specifically described above, including providing her sufficient leave to accommodate her physical impairment.

56. Providing Price with accommodations, including sufficient leave to accommodate her disability and physical impairment, would have been reasonable.

57. UTi failed to accommodate Price, including, but not limited to, failing to provide Price sufficient leave to accommodate her physical impairment and disability, and failed to provide any other reasonable accommodation.

58. UTi also failed to make a good faith effort to accommodate.  Such lack of good faith is evidence by UTi communicating to Price that she had approved leave for 22 weeks and until May 3, 2010, knowing Price relied on such communicated leave, and by reducing such leave and providing insufficient notice to Price.  UTi took such actions without first attempting to provide Price an alternate accommodation or engage in the interactive process with Price.

59. Price suffered and continues to suffer damages as a direct and proximate result of UTi's conduct alleged in this Count II, including but not limited to lost wages; back pay; because her re-employment is impracticable, front pay; lost income and fringe benefits; future lost income and fringe benefits; incidental, consequential, and punitive damages; and damages for mental anguish and emotional suffering.

60. UTi acted with malice or reckless indifference to Price's rights to not be discriminated under the ADA, and were done in knowing violation thereof.  Such reckless and intentional conduct warrants the imposition of punitive damages on UTi.

## COUNT III – MISSOURI HUMAN RIGHTS ACT

### (Gender, Pregnancy and Disability Discrimination Against UTi)

Price incorporates by reference into Count III all preceding paragraphs herein.

61. At all relevant times herein, UTi had six or more employees.

62. Price was a member of a protected class due to her sex, pregnancy and disability.

63. Price was qualified to perform her job.

64. Price suffered an adverse employment action in that she was discharged.

65. Price was treated differently from similarly situated non-pregnant, non-female, and/or non-disabled employees.

66. Price was subjected to discrimination with respect to her compensation, terms, conditions, and/or privileges of employment based on her sex, pregnancy and/or disability by UTi as described herein.

67. Price was subjected to discharge based on her sex, pregnancy and/or disability by UTi as described herein.

68. Price's sex, pregnancy, and/or disability were contributing factors to her discharge and/or to the discrimination against Price with respect to compensation, terms, privileges, and conditions of employment as described herein.

69. Price suffered and continues to suffer damages as a direct and proximate result of UTi's conduct alleged in this Count III, including but not limited to lost wages; back pay; because her re-employment is impracticable, front pay; lost income and fringe benefits; future lost income and fringe benefits; incidental, consequential, and punitive damages; and damages for mental anguish and emotional suffering.

70.     UTi acted with malice or reckless indifference to Price's rights to not be discriminated under the MHRA, and were done in knowing violation thereof.  Such reckless and intentional conduct warrants the imposition of punitive damages on UTi.

## COUNT IV – FAMILY AND MEDICAL LEAVE ACT VIOLATIONS

### (Against UTi)

Price incorporates by reference into Count IV all preceding paragraphs herein.

71.     As of December 1, 2009, Price was eligible for protection under the Family and Medical Leave Act (FMLA). In the alternative, UTi treated Price as eligible for protection under the FMLA, did not notify her at any point she was not eligible and thus, has waived any opportunity to contest Price's eligibility.

72.     Price was employed by UTi and its predecessor for at least 12 months as of the date leave commenced.

73.     Price worked for at least 1,250 hours of service during the 12-month period immediately preceding the date leave commenced.

74.     UTi was an employer required to provide its employees at the Moberly facility FMLA leave at all times relevant herein.  In the alternative, UTi has waived any argument of Price's ineligibility as UTi represented to Price that FMLA applied to her and did not notify her at any point she was not eligible.

75.     UTi employed 50 or more employees within 75 miles of the worksite where Price worked.

76.     Price provided UTi timely notice and sufficient information of her need for and intent to take leave.

77. Price provided UTi timely notice and sufficient information regarding a serious health condition related to her pregnancy.

78. Price provided UTi timely notice and sufficient information regarding her pregnancy and prenatal care.

79. UTi knew or should have known that Price intended to take leave under the FMLA for a serious health condition, pregnancy, and/or prenatal care.

80. With regard to Price's leave of absence and subsequent termination, UTi made actions and omissions which violated the FMLA including, but not limited to:

   a. failing to designate or timely designate Price's leave of absence as FMLA leave;

   b. misrepresenting the designation of the leave of absence as short-term disability and for a period of 22 weeks;

   c. failing to correct its failure to designate before causing harm to Price based on her reasonable reliance;

   d. failing to provide Price adequate notice that Price's short-term disability leave ran concurrently with her FMLA leave;

   e. failing to adequately and timely provide notice detailing the specific expectation and obligations of Price, and failing to explain any consequences of a failure to comply;

   f. failing to mail required notices to Price's proper address;

   g. failing to reinstate Price to her position as was represented to her would occur;

   h. retaliating against Price for utilizing FMLA leave;

   i. failing to adequately and timely provide notice of UTi's requirement that paid leave is substituted for unpaid FMLA leave; and

      j.    acting without consideration of the requirements of the ADA.

81. UTi's actions and failures caused Price to suffer harm, and interfered with, restrained and denied Price the exercise of her FMLA rights.

82. UTi's actions and failures discriminated against Price in the administration of UTi's paid leave policies.

83. Price suffered and continues to suffer damages as a direct and proximate result of UTi's conduct alleged in this Count IV, including but not limited to lost wages; back pay; because her re-employment is impracticable, front pay; all liquidated damages including double damages; all lost income and fringe benefits; all future lost income and fringe benefits; and all incidental and consequential damages.

84. Given appropriate notice and accurate, non-misleading information, Price would have been able to make arrangements that would have allowed her to return to work in compliance with FMLA.

85. UTi did not act with good faith and/or did not have objectively reasonable grounds to believe its actions complied with the FMLA.  Such conduct warrants the imposition of liquidated and double damages on UTi.

## COUNT V – FAMILY AND MEDICAL LEAVE ACT VIOLATIONS
### (Against John Doe and Jane Roe)

Price incorporates by reference into Count V all preceding paragraphs herein.

86. "John Doe" and "Jane Roe" are individuals who acted, directly or indirectly, in the interest of UTi in dealing with Price's leave of absence and subsequent termination.

87. "John Doe" and "Jane Roe" had power to discharge Price, had control over the terms and conditions of Price's employment, had the ability to determine Price's rate of pay and/or the method of payment, and/or maintained Price's employment records.

88. "John Doe" and "Jane Roe" were responsible in whole or in part for causing harm to Price, in interfering with, restraining and denying Price the exercise of her FMLA rights, and in discriminating against Price in the administration of its leave policies.

89. With regard to Price's leave of absence and subsequent termination, "John Doe" and "Jane Roe" made actions and omissions which violated the FMLA including, but not limited to:

    a. failing to designate or timely designate Price's leave of absence as FMLA leave;

    b. misrepresenting the designation of the leave of absence as short-term disability and for a period of 22 weeks;

    c. failing to correct its failure to designate before causing harm to Price based on her reasonable reliance;

    d. failing to provide Price adequate notice that Price's short-term disability leave ran concurrently with her FMLA leave;

    e. failing to adequately and timely provide notice detailing the specific expectation and obligations of Price, and failing to explain any consequences of a failure to comply;

    f. failing to mail required notices to Price's proper address;

    g. failing to reinstate Price to her position as was represented to her would occur;

    h. retaliating against Price for utilizing FMLA leave;

    i.   failing to adequately and timely provide notice of UTi's requirement that paid leave is substituted for unpaid FMLA leave; and

    j.   acting without consideration of the requirements of the ADA.

90.    Price suffered and continues to suffer damages as a direct and proximate result of the conduct of "John Doe" and "Jane Roe" alleged in this Count IV, including but not limited to lost wages; back pay; because her re-employment is impracticable, front pay; all liquidated damages including double damages; all lost income and fringe benefits; all future lost income and fringe benefits; and all incidental and consequential damages.

91.    "John Doe" and "Jane Roe" did not act with good faith and/or did not have objectively reasonable grounds to believe its actions complied with the FMLA.  Such conduct warrants the imposition of liquidated and double damages on "John Doe" and "Jane Roe."

**COUNT VI – IMPLIED CONTRACT, PROMISSORY AND EQUITABLE ESTOPPEL**

**(Against UTi)**

Price incorporates by reference into Count VI all preceding paragraphs herein.

92.    Prior to her leave of absence, UTi approved Price for 22 weeks of short-term disability leave and told her job would be held.

93.    Prior to her leave of absence, UTi told Price she could use 22 weeks of disability leave due to her pregnancy and she would not be terminated unless she exceeded 22 weeks of leave.

94.    Price expected and detrimentally relied on this time being available to her wthout termination, both financially and in terms of making arrangements with her physicians and family for prenatal care, delivery of the twins, and care for the twins after delivery.

95. UTi discharged Price before she was allowed to return to work and contrary to its earlier promise to provide her 22 weeks of leave before termination.

96. UTi made an unambiguous statement to Price that she could use the full 22 weeks of leave if she needed without being subject to termination.

97. UTi knew, expected or should have known Price would reasonably rely on the promise of 22 weeks of leave before termination.

98. It was foreseeable that Price would rely on the promise of 22 weeks of leave before termination.

99. Price in fact relied on the promise of 22 weeks of leave before termination to her detriment including financial reliance and reliance on such leave to make arrangements with her physicians and family for prenatal care, delivery of the twins, and care for the twins after delivery.

100. Price would suffer injustice absent enforcement of the promise of 22 weeks of leave before termination.

101. On information and belief, UTi acted in a manner that amounted to a false representation or concealment of material facts, in that UTi intended to terminate Price citing FMLA leave while falsely representing to Price that her job would be held and that her report to work date was not until May 3, 2010, and intentionally failing to provide Price with the necessary information and notice to know that her FMLA leave time was running.

102. On information and belief, UTi knew, should have known, or had constructive knowledge of the fact that Price, prior to March 25, 2010, had no knowledge or did not have sufficient information to know that her job would not be held until May 3, 2010 and/or that her FMLA leave was running, expired, or was going to be the alleged basis for her termination.

103. Price, as a direct and proximate result of UTi's actions in terminating her contrary to the promise of 22 weeks of leave before termination, suffered damages including but not limited to lost wages; back pay; because her re-employment is impracticable, front pay; lost income and fringe benefits; future lost income and fringe benefits; and incidental and consequential damages.

## PRAYER FOR RELIEF

Price prays this Court award judgment in her favor and against UTi on Counts I, II, III, IV, and VI, and against "John Doe" and "Jane Roe" on Count V, and that this Court enter its order as follows:

a. Awarding Price back pay consisting of wages, salary, and fringe benefits as provided by law;

b. Awarding Price front pay consisting of wages, salary, and fringe benefits as provided by law;

c. Awarding Price compensatory damages for future loss, emotional distress, inconvenience, mental anguish, and loss of enjoyment of life as provided by law;

d. Awarding Price liquidated damages including double damages as provided by law;

e. Awarding Price punitive damages as provided by law in an amount that is fair and reasonable;

f. Determining and awarding a reasonable attorney's fee and the costs and expenses of this action to Price and her counsel as provided by law and providing for interim payment in the case of an appeal of the judgment by UTi;

g. Awarding Price prejudgment and post-judgment interest as provided by law; and

h. Ordering such different, equitable, or further relief as the Court deems just and appropriate.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS**

        Respectfully Submitted,

        /s/ David G. Brown
        DAVID G. BROWN     #42559
        JASON R. MCCLITIS   #61611
        Brown Law Office LC
        501 Cherry Street, Suite 100
        Columbia, MO 65201
        Tel:  (573) 814-2375
        Fax:  (800) 906-6199
        dbrown@brown-law-office.com
        jmcclitis@brown-law-office.com

        *Attorneys for Plaintiff*